# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

THOMAS WAYNE FONDREN            )
                                )
         **Plaintiff,**         )
                                )
v.                              )
                                )   **Case No. 7:14-CV-00093-SLB**
CAROLYN W. COLVIN,              )
**Acting Commissioner of Social Security,**   )
                                )
         **Defendant.**         )

## MEMORANDUM OPINION

Plaintiff Thomas Wayne Fondren brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). After review of the record, the parties' submissions, and the relevant law, the court is of the opinion that the Commissioner's decision is due to be affirmed.

## I. PROCEDURAL HISTORY

Fondren applied for DIB and SSI on September 15, 2010, alleging a disability onset date of March 1, 2010. (R. 107-16).[1] The Social Security Administration denied his applications on March 9, 2011. (R. 58-67). He requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 20, 2012. (R. 30-53, 70). The ALJ denied his applications on September 24, 2012. (R. 7).

On October 7, 2012, Fondren petitioned the Appeals Council to review the

---

[1] Citations to a document number, ("Doc. __"), refer to the number assigned to each document as it is filed in the court's record. Citations to page numbers in the Commissioner's record are set forth as ("R.__").

ALJ's decision. (R. 6). On December 5, 2013, the Appeals Council denied his request for review, thereby rendering the ALJ's decision the final decision of the Commissioner of Social Security. (R. 1). Fondren timely appealed to this court. (Doc. 1).

## II. STANDARD OF REVIEW

This court reviews *de novo* the Commissioner's conclusions of law and reviews her factual findings to determine whether they are supported by substantial evidence. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007). Substantial evidence is "relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id*. (quotation and citation omitted).

## III. DISCUSSION

### A. THE FIVE-STEP EVALUATION

The Commissioner follows a five-step sequential evaluation to determine whether a claimant is disabled and eligible for DIB or SSI. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see Bowen v. City of New York*, 476 U.S. 467, 470, 106 S.Ct. 2022, 2025, 90 L.Ed.2d 462 (1986) ("The regulations for both programs are essentially the same . . ."). For the purpose of this evaluation, "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 416(i)(1)(A); *see id*. § 423(d)(1)(A).

#### 1. Substantial Gainful Activity

First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity" as defined by the regulations. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i); *see id*. §§ 404.1572, 416.972. If the claimant

is so engaged, he is not disabled. *Id*. §§ 404.1520(b), 416.920(b). Here, the ALJ determined that Fondren had not engaged in substantial gainful activity since the alleged onset date of March 1, 2010. (R. 12).

### 2. Severe Impairments

If the claimant is not engaged in substantial gainful activity, the Commissioner determines whether he suffers from a severe impairment or combination of impairments that significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii) & (c), 416.920(a)(4)(ii) & (c). If the claimant does not have such an impairment or impairments, he is not disabled. *Id*. §§ 404.1520(c), 416.920(c). Here, the ALJ found that Fondren had a severe impairment of bipolar disorder. (R. 12).

### 3. The Listings

If the claimant has severe impairments, the Commissioner determines whether, alone or in combination, they meet the duration requirement and whether they are equivalent to any one of the listed impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *see id*. §§ 404.1523, 404.1525, 404.1526, 416.923, 416.925, 416.926. If the impairments are equivalent to one of the listed impairments, the claimant is disabled. *Id*. §§ 404.1520(d), 416.920(d). Here, the ALJ found that Fondren's impairment was not equivalent to one of the listed impairments. (R. 13).

### 4. Residual Functional Capacity and Past Relevant Work

If the impairments are not equivalent to one of the listed impairments, the Commissioner assesses the claimant's residual functional capacity ("RFC"), which is the most the claimant can do despite the limitations. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(1), 416.920(a)(4)(iv), 416.945(a)(1). She considers all of the claimant's medical impairments in determining the RFC. *Id*.

3

§§ 404.1545(a)(2), 416.945(a)(2). Then, she determines whether, considering the RFC, the claimant can perform his past relevant work. *Id*. §§ 404.1520(a)(4)(iv) & (f), 416.920(a)(4)(iv) & (f). If the claimant is capable of performing his past relevant work, he is not disabled. *Id*. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Here, the ALJ determined that Fondren was capable of a full range of work at all exertional levels, with non-exertional limitations of: (1) performing simple, routine, repetitive tasks; (2) maintaining attention and concentration for two-hour periods; (3) avoiding interaction with the general public as a job duty; (4) having occasional interaction with co-workers and supervisors; (5) having non-confrontational supervision; (6) making simple work-related decisions; (7) avoiding close cooperation with co-workers; (8) being absent from work one day per month; and (9) adapting to routine and infrequent workplace changes introduced gradually. (R. 14).

The ALJ consulted a Vocational Expert ("VE") to determine whether Fondren could perform his past relevant work, considering his RFC, age, education, and work experience. (R. 49-50). The VE testified that he could perform his past relevant work as a spray painter and a palletizer. (R. 50). Based on this testimony, the ALJ found that Fondren could perform his past relevant work and was not disabled. (R. 17).

### 5. Other Work in the National Economy

Because the ALJ determined that Fondren was not disabled at step four, she did not consider whether he could perform other work that existed in substantial numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c)(1), 416.920(a)(4)(v), 416.960(c)(1); (R. 17).

## B.  FONDREN'S CLAIMS

### 1.  Weight afforded to opinion of Fondren's counselor

Fondren argues that the ALJ did not give proper weight to the opinion of his counselor Ninna Knight.  (Doc. 8 at 10-14).  He also accuses the ALJ of improperly "cherry-picking" information from his Function Report to support the RFC.  (*Id*. at 11-12).  He asserts that the ALJ improperly discounted the opinion of Dr. Charles Houston, who performed his consultative exam.  (*Id*. at 12-13).

In assessing RFC, the Commissioner may consider the opinions of "acceptable medical sources," such as physicians and psychologists, and "other sources," such as counselors and therapists.  20 C.F.R. §§ 404.1513(a) & (d)(1), 416.913(a) & (d)(1).  In weighing these opinions, the Commissioner considers whether, and the extent to which, the source examined and/or treated the claimant, the evidence supporting the opinion, whether the opinion is consistent with the record, and the source's specialty.  *Id*. §§ 404.1527(c), 416.927(c).

A treating source is an acceptable medical source who has an ongoing treatment relationship with the claimant and sees the source with a frequency consistent with accepted medical practice for the type of treatment or medical condition at issue.  *Id*. §§ 404.1502, 416.902. The Commissioner gives a treating source's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  *Id*. §§ 404.1527(c)(2), 416.927(c)(2).  She considers an RFC assessment done by a non-examining state agency physician as relevant to what the claimant can do.  *Id*. §§ 404.1513(c), 416.913(c).

Here, substantial evidence supports the ALJ's weighing of the evidence and assessment of Fondren's RFC.  From March 24 to March 30, 2007, he was admitted

to the hospital upon experiencing anger after a fight with his wife, in which he smashed his truck window with a baseball bat. (R. 281). He stabilized and, at discharge, was alert and oriented with an improved mood, no overt symptoms of psychosis, limited insight and judgment, and fair impulse control. He was diagnosed with depression and marijuana abuse and had a Global Assessment of Functioning ("GAF") score of 45. (*Id*.).

On April 2, 2007, Indian Rivers Mental Health Center ("Indian Rivers") determined his GAF score was 52, indicating moderate symptoms or difficulty in functioning. (R. 311).

On May 4, 2007, he visited the emergency room and said that he was agitated after arguing on the phone with his wife, from whom he had been separated for six weeks. (R. 272). He requested that the doctor give him "a pill" because he could not deal with the tension. He was very agitated, restless, anxious, and fidgety. (*Id*.). The doctor believed that his insight and judgment were poor, because he believed his problems would be fixed by taking a pill. (R. 273). The doctor diagnosed him with major depression, recurrent; generalized anxiety disorder; and marijuana abuse. (*Id*.). He was admitted to the hospital and given medication for his depression and anxiety. (R. 274).

He was discharged the following day after the doctor made adjustments to his medications. (R. 275). Upon discharge he was alert and oriented with appropriate mood and affect, organized thinking, and fair memory, concentration, retention, and recall. His prognosis was guarded, and the doctor diagnosed him with major depression, recurrent; insomnia; and anxiety. (*Id*.).

On December 27, 2007, he visited the emergency room and stated that he had suffered from mild depression, anxiety, and stress for several days and was "not

thinking right." (R. 258). He had received an Ativan injection at another hospital that night and reported using marijuana. (*Id*.). He was diagnosed with major depression and discharged that day when his condition improved. (R. 256).

On December 16, 2009, he visited Indian Rivers and stated that he had been out of medication for several days and felt "down." (R. 300). He said his depression level was mild, but he had difficulty with sleep and some loss of appetite. He exhibited a moderate level of functioning in daily coping and family relationships. He said that his past treatment was effective. (*Id*.). Michelle Littleton created an annual treatment plan with him (R. 321-22), which was updated on June 28, 2010, (R. 309-10), and September 30, 2010, (R. 307-08). His strengths were his ability to cooperate, community connection, and persistence. (R. 321). His barriers were his hopelessness, inability to identify self goals, and low self esteem. (*Id*.). He set objectives to prevent relapse and recurrence of his depression. (R. 321-22). He was to find an appropriate medication regimen, take medications as prescribed, engage in social activities and community functions as part of daily living, and actively seek and utilize community resources. (R. 307-10, 321-22).

On September 1, 2010, during a mental status exam performed at Indian Rivers, he was cooperative, had a concrete thought process and appropriate thought content, and was sad, anxious, and tearful. (R. 305). That day, he was admitted to North Harbor Pavilion after reporting being very depressed, angry, and anxious. (R. 240). He had "lost it" afer being refused food stamps and had damaged his property and threatened to kill himself. (R. 251). He had not taken his medication for depression in two months. (*Id*.). The doctor started him on medication, and he was discharged upon stabilization on September 5, 2010. (R. 240, 251). At discharge, he was alert with an improved mood, no symptoms of psychosis, limitations in insight and

judgment, and fair impulse control.  (R. 240).

During a September 10, 2010 mental status exam at Indian Rivers, he was cooperative, alert, and oriented and had a flat affect and an appropriate and coherent thought process.  (R. 301).  He was depressed and his thought content was guarded.  (*Id*.).  In another exam conducted that day, he was paranoid and experienced auditory hallucinations.  (R. 303).  His mood was euthymic.  (*Id*.).  The doctor prescribed further medication to control his increased depression.  (R. 307).

On October 17, 2010, he completed a Function Report and stated that he sat around his house most of the time and sometimes visited his mother's house.  (R. 142, 149).  He attended to his personal care, prepared his meals everyday, and did most of the indoor chores.  (R. 143-44).  He avoided yard work because his medication prevented him from being in the heat.  (R. 145).

He stated that he went outside two to three times a day and drove a car to get around.  (R. 145).  He went to the store once a week to purchase food and household items.  (*Id*.).  He watched television and listened to the radio everyday.  (R. 146).  He spent time with others everyday, but mostly just with his family because he was nervous around crowds.  He went to his mother's house and a friend's house on a regular basis.  He did not need to be reminded to go places or need anyone to go with him.  (*Id*.).

He stated that he did not have problems getting along with family, friends, neighbors, or others, but it bothered him to be around a lot of people.  (R. 147).  He had issues with memory and concentration, but could pay attention "very well."  He would finish what he started and was able to follow written instructions well.  He could follow spoken instructions fairly.  (*Id*.).  He got along fairly with authority figures, and had been fired from a job at Cahaba Veneer because he could not take the

"pressure of someone standing over [him] fussing about [his] work." (R. 148). He could not handle stress well and could handle changes in routine fairly. (*Id*.).

During a mental status exam conducted at Indian Rivers on December 10, 2010, he appeared unkempt but was cooperative and had an appropriate, goal-directed, and coherent thought process with appropriate thought content. (R. 317). His mood was euthymic. He was alert and oriented and had a neutral affect. (*Id*.). His doctor did not change his treatment. (R. 319).

On January 12, 2011, Dr. Houston examined him and noted that his orientation was good and his thought processes and speech were appropriate. (R. 195-96). He had no loose associations or confusion, and his mood and affect were appropriate. (R. 196). He was cooperative, interested, and persistent and could concentrate pretty well. Dr. Houston diagnosed him with bipolar disorder, primarily depressed, with reported history of psychotic features. (*Id*.).

Dr. Houston stated that Fondren was capable of performing basic daily activities, and his behavior and appearance were good. (R. 197). His activities were moderately to severely restricted. His interests were moderately constricted, and his ability to relate to others was affected. He might have needed assistance with personal and financial affairs and had minor problems with concentration, but was persistent. He adapted well to the changing conditions of the evaluation, but would have difficulty with total independent functioning. His ability to meet the demands of competitive employment was affected. (*Id*.).

On January 19, 2011, he visited Indian Rivers and reported that his medications were somewhat effective. (R. 315). He experienced anhedonia and sleeplessness, and was having numerous family conflicts. (*Id*.). He had a GAF score of 57, evidencing moderate functional impairments. (R. 316). While he had experienced

some progress with treatment, he had a history of non-compliance with treatment. (*Id.*).

On that day, he created another annual treatment plan with Michelle Littleton to stabilize his depression and anxiety and increase his ability to function on a daily basis. (R. 319-20). He reported good progress with his medication and no symptoms of depression. (R. 319). He set an objective of being 100 percent compliant with his medications and being able to verbalize the importance of taking medication as prescribed in controlling his symptoms. (R. 319-20).

Dr. Melissa Jackson assessed Fondren's RFC on March 9, 2011. (R. 212-14). She determined that his ability to do the following was not significantly limited: (1) remember locations and work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) sustain an ordinary routine without special supervision; (4) make simple, work-related decisions; (5) ask simple questions or request assistance; (6) be aware of normal hazards and take appropriate precautions; (7) travel in unfamiliar places or use public transportation; and (8) set realistic goals or make plans independently of others. (R. 212-13). He was moderately limited in the following: (1) understanding, remembering, and carrying out detailed instructions; (2) maintaining attention and concentration for extended periods; (3) performing activities with a schedule, maintaining regular attendance, and being punctual with customary tolerances; (4) working in coordination with or in proximity to others without being distracted; (5) completing a normal work day and work week without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; (6) interacting appropriately with the general public; (7) accepting instructions and responding appropriately to criticism from supervisors; (8) getting

along with co-workers or peers without distracting them or exhibiting behavioral extremes; (9) maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and (10) responding appropriately to changes in the work setting. (*Id.*).

Dr. Jackson explained that Fondren occasionally would have difficulty with remembering and carrying out complex, multi-stepped tasks, but would have no difficulty with simple work instructions and procedures. (R. 214). While he would have difficulty maintaining concentration at times, he could focus for two hours on simple tasks. He would miss one to two days of work per month due to his mental health symptoms. Because he was irritable, he would work best in a well-spaced environment with occasional tasks requiring a coordinated effort with co-workers. (*Id.*).

Dr. Jackson determined that he could only handle casual, not intensive, and infrequent contact with the public and co-workers. (*Id.*). Thus, he was capable of working in situations with limited contact with the public and limited work responsibilities requiring social interaction. He could only handle infrequent, gradually introduced changes in the workplace. (*Id.*).

During mental status exams at Indian Rivers on May 13 and November 11, 2011, he was appropriately groomed and cooperative and had appropriate thought processes and content. (R. 331, 333). He experienced no hallucinations or delusions and his mood was euthymic. (*Id.*).

On January 30, 2012, he created another annual treatment plan at Indian Rivers, this time with the help of clinician Ninna Knight. (R. 329; *see* R. 326). On that day, he had a GAF score of 60, which represented moderate symptoms or difficulty in functioning. (R. 330). On May 21, 2012, a mental status exam indicated that he was

appropriately groomed, alert, oriented, and cooperative and had an appropriate thought process and content with no hallucinations. (R. 327). He was depressed and anxious, but had a neutral affect and normal sleep patterns. (*Id*.).

On August 8, 2012, Knight completed an RFC assessment form. (R. 325-26). She stated that Fondren had moderately severe limitations in (1) relating to other people; (2) the breadth of his interests; (3) understanding, carrying out, and remembering instructions; (4) responding appropriately to supervision, co-workers, and customary work pressures; and (5) performing complex or varied tasks. (R. 325). He was moderately limited in his ability to complete daily activities, keep up his personal habits, and perform simple or repetitive tasks. (*Id*.). Knight had not performed a psychological evaluation on Fondren. (R. 326). She stated that his medication caused him to be agitated, hostile, and hyperactive, and to hallucinate. (*Id*.).

At the hearing before the ALJ, Fondren testified that he could not be around a crowd of people because he liked to be by himself and had experienced a nervous breakdown. (R. 35-36). His medication helped his symptoms by making him calmer and allowing him to tolerate being around a few people. (R. 36, 38). He lived at home with his mother and niece and sat in his room everyday with the lights off. (R. 38-39, 43). He walked around outside sometimes and mowed the grass every couple of weeks. (R. 39, 45). He sometimes read the newspaper and understood some of it. (R. 44-45). He took out the trash, but his mother or niece did the rest of the house work. (R. 45).

He would drive to the grocery store and sometimes visited a friend's house, but preferred to be by himself. (R. 39-40). He did not go out to eat or to the movies because he could not handle being around crowds. (R. 40). Going to a business or

restaurant made him nervous because he could not "cut" the noise level. (R. 43). He had concentration problems, and would forget what he had watched on television. (R. 44).

On appeal, Fondren asserts that the ALJ did not give proper weight to Knight's opinion. (Doc. 8 at 10-11). To the extent that he asserts the ALJ should have given Knight's opinion controlling weight, this assertion is in error because Knight is not an acceptable medical source or treating source under the regulations. *See* 20 C.F.R. §§ 404.1502, 404.1527(c)(2), 416.902, 416.927(c)(2). While Knight worked with Fondren in establishing his treatment plan for 2012, there is no evidence that she ever examined him. *See id.* §§ 404.1527(c)(1), 416.927(c)(1); (R. 326, 329). To the extent that she had a treating relationship with him, there is no evidence that she saw him more than once before completing the RFC assessment, and her notes from that visit do not support her assessment of his limitations. *See* 20 C.F.R. §§ 404.1527(c)(2)(i) & (c)(3), 416.927(c)(2)(i) & (c)(3). Furthermore, her assessment is not supported by the objective medical evidence. (R. 16); *see* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).

Fondren's treatment plan at Indian Rivers included increasing social contact. (R. 308, 310). His need for inpatient treatment was immediately preceded by specific stresses in his life, not mere exposure to co-workers or people in general. (R. 251, 272, 281). He reported to his doctors and to the ALJ that his medications were effective, and Indian Rivers noted that he experienced progress with treatment when he was compliant. (R. 36, 38, 315-16, 319). When he was admitted to the hospital in 2010, he had not taken his medication for two months. (R. 251). Further, none of the records from Indian Rivers indicate more than moderate functional impairments. (R. 300, 316, 330).

Knight's assessment was also inconsistent with Fondren's Function Report and testimony. He shopped in public once a week and visited a friend's house, spending time with others everyday. (R. 39-40, 145-46). He did not have any problems getting along with family, friends, and neighbors. (R. 147). While he had issues with memory and concentration, he could pay attention and follow written instructions well. (*Id*.). He had a fair ability to follow spoken instructions, get along with authority, and handle changes in routine. (R. 147-48).

While Knight's assessment is somewhat consistent with the opinion of Dr. Houston, the ALJ did not err in giving limited weight to Dr. Houston's opinion. The medical evidence does not support the level of limitation described by him. Further, Knight's and Dr. Houston's opinions were inconsistent with that of Dr. Jackson. The ALJ did not err in giving great weight to Dr. Jackson's opinion, as it was supported by the objective medical evidence discussed above. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).

For these reasons, the ALJ did not err in giving limited weight to Knight's opinion. Moreover, the ALJ's RFC assessment accounted for Fondren's limitations that are supported by the objective medical evidence.

**2. ALJ's Credibility Finding**

Fondren argues that the ALJ improperly discredited his testimony as to the intensity, persistence, and limiting effects of his symptoms. (Doc. 8 at 14-15).

To prove a disability based on a claimant's testimony as to his symptoms, the claimant must present evidence of an underlying medical condition; and either objective medical evidence confirming the severity of the symptoms, or evidence showing that the objectively determined medical condition can reasonably be expected to give rise to the symptoms. 20 C.F.R. §§ 404.1529(a), 416.929(a); *Wilson*

*v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). The ALJ must provide explicit and adequate reasons for discrediting the claimant's testimony as to his symptoms. *Wilson*, 284 F.3d at 1225. If the ALJ does not, the court must accept the testimony as true. *Id*.

When the ALJ determines that an underlying impairment reasonably could be expected to produce the symptoms the claimant describes, he evaluates the intensity and persistence of the symptoms to determine the extent to which they affect the claimant's ability to work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). Throughout this evaluation, the ALJ considers a range of medical and other evidence, such as evidence of the claimant's daily activities, side effects of medication used to treat the symptoms, and measures the claimant takes to alleviate the symptoms. *Id*. §§ 404.1529(c)(3), 416.929(c)(3).

Here, the ALJ determined that Fondren's medically determinable impairments reasonably could be expected to cause some of the symptoms, but his testimony as to the intensity, persistence, and limiting effects was not credible to the extent that it was inconsistent with the RFC. (R. 15). The ALJ determined that the medical evidence and Fondren's testimony did not support his extreme allegations of an inability to be around others or go in public. (R. 17). Her finding is supported by substantial evidence.

As discussed above, the objective medical evidence does not support a finding of further limitations not accounted for in the RFC, and Fondren did not show that his impairment reasonably could be expected to give rise to the extreme symptoms he described. *See Wilson*, 284 F.3d at 1225. The ALJ addressed Fondren's discomfort with social interaction by limiting his exposure to others to occasional interactions with only co-workers and supervisors. (R. 14). She addressed his issues with

15

concentration by limiting him to simple instructions and work-related decisions. She further reduced the amount of stress that he would be exposed to by limiting him to infrequent, gradual workplace changes, and allowing for an absence of one day per month to cope with the effects of his impairment. (*Id*.).

## IV. CONCLUSION

Based on the reasons set forth above, the decision of the ALJ, as adopted by the Commissioner, denying Fondren's applications for DIB and SSI is due to be affirmed. An Order affirming the decision of the Commissioner will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 10th day of August, 2015.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE